# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JENNIFER BEATTIE, RENATE BLACK,
DARREN DRURY, JEFFREY JACKOWSKI,
CRAIG JOSEPH, AURORA NORTHRUP,
LISA STRONG, STEWARD SZCZEPANSKI,
ANGEL VIANUEVA, and
PAUL WIEDERHOLD,                                    Case No.

Plaintiffs,                                         Hon.

v.

ORGAN PROCUREMENT AGENCY OF
MICHIGAN d/b/a GIFT OF LIFE MICHIGAN,

     Defendant.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
Kara F. Krause (P85487)
Brendan J. Childress (P85638)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
617 Detroit St., STE. 125
Ann Arbor, MI 48104
(844) 847-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com
kara@hurwitzlaw.com
brendan@hurwitzlaw.com

---

There is no other pending or resolved civil action arising out
of this transaction or occurrence alleged in the Complaint.

## **COMPLAINT AND JURY DEMAND**

Plaintiffs Jennifer Beattie, Renate Black, Darren Drury, Jeffrey Jackowski, Craig Joseph, Aurora Northrup, Lisa Strong, Steward Szczepanski, Angel Vianueva, and Paul Wiederhold (collectively, "Plaintiffs"), by and through their attorneys, HURWITZ LAW PLLC, state the following for their Complaint and Jury Demand against Defendant Organ Procurement Agency of Michigan d/b/a Gift of Life Michigan ("Defendant'):

## INTRODUCTION

1.     There is no "pandemic exception" to the protections afforded by Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*.  Defendant did not understand its legal obligations when it blanketly terminated 10 employees who submitted religious and medical accommodations to the COVID-19 vaccine. Instead of engaging with its employees in the spirit of "bilateral cooperation" that is required by the law, Defendant imposed a strict vaccine mandate that allowed for no reasonable accommodations.   Accordingly, this action is meant to remedy Defendant's unlawful discrimination against employees who requested religious and/or medical accommodations from Defendant's vaccine mandate.

## PARTIES, JURISDICTION, AND VENUE

2.     Plaintiff Jennifer Beattie ("Ms. Beattie") was a Donation Coordinator for Defendant.  Ms. Beattie submitted a religious accommodation request on July

28, 2021, to which Defendant responded by terminating Ms. Beattie on October 25, 2021, after temporarily placing her on an involuntary indefinite unpaid leave of absence. Ms. Beattie is a citizen and resident of Michigan, and lives in Davison, Michigan. She filed an Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination alleging religious discrimination and retaliation on October 6, 2021.

3.      Plaintiff Renate Black ("Ms. Black") was a Tissue Procurement Specialist III for Defendant. Ms. Black submitted a medical accommodation request on July 27, 2021, to which Defendant responded by terminating Ms. Black on October 25, 2021 after temporarily placing her on an involuntary indefinite unpaid leave of absence. Ms. Black is a citizen and resident of Michigan, and lives in Detroit, Michigan. She filed an EEOC Charge of Discrimination alleging disability discrimination and retaliation on October 6, 2021.

4.      Plaintiff Darren Drury ("Mr. Drury") was a Facilities Coordinator for Defendant. Mr. Drury submitted a religious accommodation request on September 1, 2021, to which Defendant responded by terminating Mr. Drury on October 25, 2021 after temporarily placing him on an involuntary indefinite unpaid leave of absence. Mr. Drury is a citizen and resident of Michigan, and lives in the Pinckney, Michigan. He filed an EEOC Charge of Discrimination alleging religious discrimination and retaliation on October 8, 2021.

5.      Plaintiff Jeffrey Jackowski ("Mr. Jackowski") was a Maintenance Coordinator for Defendant.  Mr. Jackowski submitted a religious accommodation request on August 13, 2021, to which Defendant responded by terminating Mr. Jackowski on October 25, 2021 after temporarily placing him on an involuntary indefinite unpaid leave of absence.  Mr. Jackowski is a citizen and resident of Michigan, and lives in the Eastern District of Michigan. He filed an EEOC Charge of Discrimination alleging religious discrimination and retaliation on October 7, 2021.

6.      Plaintiff Craig Joseph ("Mr. Joseph") was a Donation Coordinator for Defendant.  Mr. Joseph submitted a religious accommodation request on August 5, 2021, to which Defendant responded by terminating Mr. Joseph on October 25, 2021 after temporarily placing him on an involuntary indefinite unpaid leave of absence. Mr. Joseph is a citizen and resident of Michigan, and lives in Rochester, Michigan. He filed an EEOC Charge of Discrimination alleging religious discrimination and retaliation on October 7, 2021.

7.      Plaintiff Aurora Northrup ("Ms. Northrup") was a Senior People & Culture Generalist for Defendant.    Ms. Northrup submitted a religious accommodation request on August 10, 2021, to which Defendant responded by terminating Ms. Northrup on October 25, 2021 after temporarily placing her on an involuntary indefinite unpaid leave of absence.  Ms. Northrup is a citizen and

4

resident of Michigan, and lives in Whitmore Lake, Michigan.  She filed an EEOC Charge of Discrimination alleging religious discrimination and retaliation on October 6, 2021.

8.     Plaintiff Lisa Strong ("Ms. Strong") was an Organ Allocation Specialist for Defendant.  Ms. Strong submitted a religious accommodation request on August 10, 2021, to which Defendant responded by terminating Ms. Strong on October 25, 2021 after temporarily placing her on an involuntary indefinite unpaid leave of absence.  Ms. Strong is a citizen and resident of Michigan, and lives in Lincoln Park, Michigan.   She filed an EEOC Charge of Discrimination alleging religious discrimination and retaliation on October 6, 2021.

9.     Plaintiff Steward Szczepanski ("Mr. Szczepanski") was a Donation Coordinator III for Defendant.   Mr. Szczepanski submitted a religious accommodation request on August 4, 2021, to which Defendant responded by terminating Mr. Szczepanski on October 25, 2021 after temporarily placing him on an involuntary indefinite unpaid leave of absence.  Mr. Szczepanski is a citizen and resident of Michigan, and lives in Jackson, Michigan.  He filed an EEOC Charge of Discrimination alleging religious discrimination and retaliation on October 6, 2021.

10.     Plaintiff Angel Vianueva ("Ms. Vianueva") was a People & Culture Generalist for Defendant.  Ms. Vianueva submitted a medical accommodation request on July 26, 2021, to which Defendant responded by terminating Ms.

Vianueva on October 25, 2021 after temporarily placing her on an involuntary indefinite unpaid leave of absence. Ms. Vianueva is a citizen and resident of Michigan, and lives in Brownstown, Michigan. She filed an EEOC Charge of Discrimination alleging disability discrimination and retaliation on October 6, 2021.

11.     Plaintiff Paul Wiederhold ("Mr. Wiederhold") was an Organ Recovery Specialist for Defendant. Mr. Wiederhold submitted a religious accommodation request on August 6, 2021, to which Defendant responded by terminating Mr. Wiederhold on October 25, 2021 after temporarily placing him on an involuntary indefinite unpaid leave of absence. Mr. Wiederhold is a citizen and resident of Ohio, and lives in Maumee, Ohio. He filed an EEOC Charge of Discrimination alleging religious discrimination and retaliation on October 6, 2021.

12.     All Plaintiffs received their Right to Sue letters from the EEOC.

13.     Defendant Organ Procurement Agency of Michigan, d/b/a Gift of Life Michigan is a Michigan domestic nonprofit corporation with its principal place of business in Ann Arbor, Michigan. Defendant regularly operates its services of organ and tissue donation across various hospitals in the State of Michigan. Defendant is located within this judicial district; a substantial portion of which is located in Washtenaw County, Michigan.

14.     The Eastern District of Michigan has jurisdiction over the Title VII and ADA claims pursuant to 29 U.S.C. § 1331.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events complained of herein occurred in this District and Division.

## FACTUAL ALLEGATIONS

**Defendant's Response to COVID-19 and Mandatory Vaccine Policy**

16.     In Spring 2020, the novel COVID-19 virus spread rapidly around the world.

17.     However, Defendant's organ and tissue donation services never ceased during the COVID-19 pandemic.

18.     To limit the spread of COVID-19, Defendant implemented mitigation procedures for its workforce, including requiring employees to wear masks or other personal protective equipment ("PPE"), maintain distance from others, and participate in temperature checks.

19.     In or about December 2020, Defendant began inquiring into the vaccination status of its employees.  An email from Defendant's Manager of Organ Services Rita Erickson on December 21, 2020, provides: "[w]hen you complete your COVID-19 vaccine, please email me.  I only need to know when you complete the 2-step process.  If you are choosing not to get the vaccine at this time (which we all know it is *not* mandatory), please email me personally and let me know."

20.     Defendant collected names of unvaccinated employees despite Ms. Erickson acknowledging that receiving a COVID-19 vaccine was mandatory and/or a condition of employment.

21.     At that time, the Food and Drug Administration ("FDA") had not fully approved *any* COVID-19 vaccine.

22.     The FDA granted full approval for the Pfizer COVID-19 vaccine on August 23, 2021.

23.     The FDA granted full approval for the Moderna COVID-19 vaccine on January 31, 2022.

24.     On December 29, 2020, Ms. Erickson sent an email requesting employees to disclose the dates of their first and second doses of a COVID-19 vaccine.

25.     On January 4, 2021, Ms. Erickson sent another email requesting employees to disclose the date(s) they receive a COVID-19 vaccine.

26.     On January 7, 2021, Defendant's Chief Executive Officer Dorrie Dils sent an email announcing that Defendant secured vaccinations for "**ALL STAFF** at Gift of Life Michigan who wishes to be vaccinated."  The email continued, "[f]or those of you who have concerns or hesitations about being vaccinated, we are working on an educational session with Dr. Punch, our medical director."

27.    Defendant therefore sought to "educate" employees with religious "concerns or hesitations about being vaccinated."

28.    On January 12, 2021, Ms. Erickson sent an email to unvaccinated employees, stating: "If you are getting this email, it is because you filled out the organizational survey for COVID Vaccinations, and it is now time for you (and your staff) to schedule your first shots of the COVID vaccine."

29.    Ms. Erickson's January 12, 2021 email did not inform unvaccinated employees that they were eligible for religious or medical exemptions from the vaccine.

30.    On February 17, 2021, Defendant's Vice President, Regulatory Compliance and General Counsel, Jeffery Wisniewski, emailed employees that appropriate safety measures could still be followed regardless of vaccination status. He stated, "[p]lease remember to continue with all safety, masking and distancing requirements, whether or not you have received the COVID-19 vaccine."

31.    On March 30, 2021, Mr. Wisniewski emailed unvaccinated employees requesting an update on their vaccination status.  Again, he noted that appropriate safety measures could still be followed regardless of vaccination status.

32.    On July 1, 2021, Defendant announced it would impose a mandatory COVID-19 vaccination policy for all employees beginning September 10, 2021.

The announcement stated that Defendant would accommodate "an approved exemption."

33.    The mandate was for the purposes of "eliminating this devastating virus in our community" and to "operate fully in our donor hospitals."

34.    Ms. Dills further represented that the Company would "not require vaccination of some employees but not others."

35.    On July 21, 2021, Manager of Talent Operations Meghan Hudson emailed employees, "[y]ou are receiving this email because we have not (i) received a photo of your vaccination card as described below at vaccine@golm.org; (ii) otherwise verified your vaccination status; or (iii) received an application for an exemption/accommodation."

36.    In August 2021, Ms. Dills sent a "CEO Newsletter" stating that Defendant was instituting a policy that blanketly denied employees religious or medical accommodations.  It provided:

> I want to recognize that some teams are seeing or will see turnover because of this requirement, which goes into effect Sept. 10, 2021. I respect everyone's individual rights, one of which is not to be vaccinated. **Since that is not an option at Gift of Life Michigan, we will be parting ways with some team members.** We are working very hard to fill those vacancies and will bring in temporary help until we are back to normal staffing levels.

37.    Ms. Dills stated in the letter, "[i]t would be impossible for us to continue to do our work effectively without a fully vaccinated workforce."

10

38.     Defendant's vaccination mandate does not provide any alternative for periodic testing, mask wearing, social distancing, even for employees who have already had COVID-19 and still enjoy natural immunity from the disease.

39.     Defendant has never mandated other vaccinations as a requirement for employment in in the past.

40.     Defendant does not obligate the contractors it hires to perform daily cleaning in Defendant's building to take the COVID-19 vaccine, which includes the companies Populist Cleaning, Co. and Corporate Cleaning.

**Defendant's COVID-19 Preparedness and Response Plan**

41.     On July 1, 2021, the same day it announced mandatory vaccines for all employees, Defendant implemented its newest COVID-19 "Preparedness and Response Plan" (the "Plan").

42.     The Plan was implemented "[i]n order to protect the health and safety of its employees . . .."

43.     Defendant established the following risk classifications by job location: high risk employees work in laboratory or Surgical Centers (inclusive of Donor Care Units, Recovery Rooms, and Changing Rooms); medium risk employees work in donor hospitals, main entry/hallways, and the warehouse; low risk employees work in administrative offices, clinical offices, third floor area, the Tissue Center, and volunteer areas.

44.     Defendant's Plan outlined protocols for protective equipment, stating:

i.      All staff are required to utilize PPE inside of the facility and at outside hospitals as directed. [Gift of Life Michigan] will provide employees with PPE at no cost as necessary for performance of job functions; and

ii.     All staff are required to utilize appropriate PPE, including masks, face shield/eye protection and isolation gowns, as provided and directed by [Gift of life Michigan] to protect from exposure during aerosol-generating procedures.

45.     Although Defendant's Plan expressly confirms it can provide PPE to all employees, Plaintiffs were informed that PPE was not a reasonable accommodation.

46.     Plaintiffs' vaccination mandate did not account for employee risk classifications.

47.     Defendant's Plan also instructs on physical distancing measures:

All employees, except those fully vaccinated per CDC guidelines, are to avoid sharing offices, desks, telephones, or other tools/equipment, and are to perform their work in such a way as to avoid coming within six feet of other individuals. When impossible due to job duties or physical limitations, (e.g., shared workstations), employees should use provided PPE, maintaining as much distance as possible under the circumstances, as well as disinfectant on all commonly used surfaces at the beginning and conclusion of each shift.

48.     Although Defendant's Plan describes social distancing measures for all employees, Plaintiffs were informed that physical distancing was not a reasonable accommodation.

49.     Defendant's Plan also required employees to submit to daily health screenings:

> Everyone entering the facility (including employees, vendors and visitors) will be required to complete a health screening as described herein prior to entry. Failure or refusal to complete the screening requirements are cause for refusal of entry and/or removal. The health screening will including the following: personal identification, questionnaire including verification of no symptoms, positive COVID-19 test or confirmed COVID-19 diagnosis. Anyone with a positive COVID-19 test, confirmed COVID-19 diagnosis, or exhibiting symptoms of COVID-19 will not be permitted to enter the facility. Health screening records shall be maintained for a period of 6 months.

50.     Defendant's Plan states that an employee who tests positive for COVID-19, but is asymptomatic, "may return to work as directed by their health care provider, or at least after 10 days have passed since the date of their first positive viral diagnostic test."

## Plaintiffs' Religious Accommodation Requests

51.     Defendant's Request for Religious Exemption/Accommodation form contained merely two questions for employees to answer: (1) "Please explain below why you are requesting an Exemption/Accommodation;" and (2) "In some cases, GOLM will need to obtain additional information and/or documentation about your religious practice(s) or belief(s).  We may need to discuss the nature of your religious belief(s), practice(s) and accommodations with your religion's spiritual leader (if

applicable) or religious scholars to address your request for an exception.   If
requested, can you provide documentation to support your belief(s) and need for an
accommodation?"

52.   All Plaintiffs submitted religious accommodations requests before the
required date of September 10, 2021.

53.   Ms. Beattie submitted a religious accommodation request on July 28,
2021, which provided, in pertinent part:

> I am a Christian who is a follower of Jesus Christ.  My
> faith in Jesus Christ's exemplary work for me through His
> sinless life, death upon the cross, burial, and resurrection
> is at the center of who I am, what I do, and how I live my
> life.  I firmly believe the message of John 3:16, which says,
> "For God so loved the world, and that he gave his only
> begotten Son, that whosoever believeth in him should not
> perish, but have everlasting life."  I have done the very
> thing that this verse tells me I must do to receive God's
> gift of salvation from my sins, and because of my faith in
> Jesus Christ as my Lord and Savior, I have complete
> confidence that I am a child of God…
>
> … I posses certain religious and spiritual convictions
> about my mind, body, and soul.  These are based on my
> understanding of God and why he created me the way that
> He did.  These spiritual/religious convictions lead me to
> the firm belief that I must not accept in any way the
> COVID-19 vaccination into my body.  This is, for me, a
> strong religious conviction.

54.   Mr. Drury submitted a religious accommodation request on September
1, 2021, which provided, in pertinent part:

> In the past few months, I have grown in my faith and have
> a deeper understanding of the Bible.  As a Christian and
> member of the Body of Christ, my sincerely held religious
> beliefs are an encompassing aspect of my life.  My
> Christian beliefs prevent me from doing things against my
> will.  My blood is sacred, and life is found in blood.  My
> own salvation was bought and paid for by Jesus Christ and
> I cannot taint my blood unwillingly with this vaccine.  The
> Bible warns against this type of pharmakeia and I cannot
> unwillingly violate my Christian beliefs.

55.    Mr. Jackowski submitted a religious accommodation request on August

13, 2021.  In addition, Mr. Jackowski offered the contact information for his pastor,

Father Mathias Thelen, but Defendant never contact him

56.    Mr. Joseph submitted a religious accommodation request on August 5,

2021.   In addition, Mr. Joseph attached a three-paged letter to Ms. Hudson

explaining his religious beliefs and proposing reasonable accommodations.

57.    Ms. Northrup submitted a religious accommodation request on August

10, 2021, which provided:

> I am requesting an exemption due to my ethical and moral
> concerns that the COVID-19 injection has PCR.C6 retinal
> tissue and HEK kidney tissue of aborted fetuses.  This was
> used in the development, lab testing, and production of the
> injection.

58.    Ms. Strong submitted a religious accommodation request on August 10,

2021, which provided, in pertinent part:

> I have prayed on this matter, deeply meditating with God's
> guidance.  It is my devoted faith to allow God's lead, and
> through him all things will be healed.  Psalms 91 says if

> we make and say (Mark 11:23, 24) that the Lord is our
> refuge and fortress then no pestilence or plague or evil
> shall come near our dwelling.  Psalms 103 says God
> forgives our iniquities and heals all our diseases.
>
> I hold the above sincere and true.  I maintained working
> throughout this pandemic for Gift of Life Michigan
> adhering to mask and distancing policies with no adverse
> reactions…. Through prayer, God has directed me not to
> get vaccinated.  I hold first my relationship with God
> above all else.

59.    Mr. Szczepanski submitted a religious accommodation request on

August 4, 2021, which provided, in pertinent part:

> As a member of the Catholic Church, I accept the universal
> teaching body of the Church called the magisterium.  The
> Catholic Church is clear on the official teachings in regard
> to man having right to act in conscience, free from both
> coercion and restraint and I am morally bound to obey the
> judgment of my conscience.

In addition, Mr. Szczepanski attached a letter from his priest, Father Brian Lenz,

which further elaborated on Mr. Szczepanski's sincerely held religious beliefs

precluding vaccination.

60.    Mr. Wiederhold submitted a religious accommodation request on

August 6, 2021, which provided, in pertinent part:

> As someone raised in the Christian faith with sincerely
> held beliefs, I am requesting a religious exemption from
> receiving the COVID-19 vaccine as it will violate my
> religious beliefs and practices.  Receiving any vaccine that
> uses aborted fetal cells in the development, design, protein
> production, and testing towards a final product will violate
> my religious beliefs and practices.   The COVID-19

16

vaccination goes against my religious beliefs and practices
which I will not violate.

**Plaintiffs' Medical Accommodation Requests**

61.    Ms. Black submitted a medical accommodation request on July 27,
2021, which was signed by her medical provider and noted Ms. Black's history of
previous allergic reactions indicating an immediate hypersensitivity reaction to a
component of the COVID-19 vaccine.

62.    Ms. Vianueva submitted a medical accommodation request on July 26,
2021 which was signed by her medical provider and noted Ms. Vianueva's history
of previous allergic reactions indicating an immediate hypersensitivity reaction to a
component of the COVID-19 vaccine.

**Plaintiffs Could Have Performed Remote Work**

63.    On July 20, 2021, Organ Allocation Manager Sasha Adams distributed
a "Remote Work Agreement" to all employees, which demonstrates that the Organ
Allocation Specialist position could be performed remotely.

64.    Ms. Strong was employed as an Organ Allocation Specialist.
Defendant rejected Ms. Strong's remote accommodation request even though she
already works under a remote work contract.

65.    Defendant approved a work from home accommodation for Ms.
Strong's colleague, Kasmere Cheek, who holds the same position as an Organ
Allocation Specialist, but instead submitted a *medical* accommodation request.

17

66.     Ms. Vianueva sent an email to Mr. Wisniewski on September 9, 2021, detailing possible accommodations for her position.  Ms. Vianueva noted that her responsibilities as a People & Culture Generalist have been performed safely on Defendant's premises while wearing PPE and maintaining social distancing. Likewise, Ms. Vianueva expressed that her work can be completed remotely through Microsoft Teams.

67.     Mr. Wisniewski responded on September 9, 2021, stating: "… while we were able to implement such temporary measures over the past 18 months to accommodate employees until the vaccine became available, these measures are no longer the best way to ensure the safety of our community."

68.     Mr. Wiederhold listed a number of accommodations Defendant refused to offered him in an email to Ms. Hudson on August 28, 2021, stating "[t]here are still tasks I can complete during this time at home such as virtual staff meetings, educational webinars, projects for my managers/department[,] etc."  Defendant refused his accommodation request.

69.     Plaintiffs that were capable of performing remote work were not offered an accommodation, demonstrating that Defendant had a policy discriminating against employees requesting religious accommodations.

70.     Defendant recently posted on the internet that it is accepting applications for the remote position of "Hospital Donation Advocate."

71.     Several Plaintiffs are fully trained for the position of Hospital Donation Advocate and were not offered the position as an accommodation.

## Defendant's Response to Accommodation Requests

72.     On August 27, 2021, Defendant distributed Plaintiffs identical responses to their accommodation requests, stating that Defendant had failed to make a "determination at this point as to whether you have established a sincerely held religious belief or practice that supports your objection to the vaccination," and then paradoxically stated, "your request for a Religious exemption is nevertheless granted."

73.     Defendant's initial granting of Plaintiffs' accommodation requests was subterfuge.

74.     Rather than truly granting Plaintiffs' accommodation requests, Defendant stated, "[w]e have therefore **decided to accommodate you by placing you on an unpaid leave of absence** beginning September 11, 2021."

75.     Involuntary indefinite unpaid leave is not an accommodation; it is the functional equivalent of termination.

76.     "Being placed on indefinite unpaid leave because your employer doesn't like your religious beliefs is obviously an adverse employment action and an actionable claim under Title VII of the Civil Rights Act of 1964.  And you've obviously suffered irreparable injury when you're forced to violate your faith in

order to get your job back." *Sambrano v. United Airlines, Incorporate*, No. 21-11159, 2022 WL 3572372, at *2 (5th Cir. Aug. 18, 2022) (Ho, J. concurring).

77.     The August 27, 2021 determination letters also indicates that Plaintiffs' insurance benefits would cease after September 30, 2021, and that Defendant would distribute information on the Consolidated Omnibus Budget Reconciliation Act ("COBRA").  Hence, Plaintiffs had been terminated.

78.     Defendant's explanation for the decision was that "all requests were reviewed on an individual basis."

79.     Defendant's religious animus is demonstrated by the fact that it granted unvaccinated Huron Valley Ambulance workers an accommodation to work on-site with an N-95 mask but denied Plaintiffs the same accommodation.

80.     Defendant's religious animus is further demonstrated by the fact that Defendant provided medical exemptions, including to an employee who was pregnant.

81.     If Defendant were concerned about potential outbreaks caused by unvaccinated people on Defendant's premises, Defendant would not exempt pregnant employees even though the Center for Disease Control and Prevention ("CDC") strongly recommends COVID-19 vaccination during pregnancy.

82.     Statewide hospital systems are granting religious accommodations to their own employees and allowing access to unvaccinated members of the public.

83.    Defendant does not require patients who acquire organ and tissue donations to be vaccinated, even though these individuals interact with Defendant's staff.

84.    On September 3, 2021, Ms. Hudson stated:

> Regarding employees for whom gaining access to hospitals and facilities we serve is an essential function of their jobs, it is important to note that Gift of Life Michigan serves over 170 such facilities. While any one of those facilities that deny access to unvaccinated individuals may allow exemptions and certain accommodations under certain circumstances, there is not a singular accommodation that would permit access to all such facilities at any given point in time, particularly if not every facility we serve has the same requirements with respect to the unvaccinated and to the extent those requirements may change over time. Our inability to properly service these facilities **by not having a fully vaccinated staff puts us in a position of not being able to fulfill our Mission**.

85.    Defendant is an Organ Procurement Organization ("OPO").

86.    Ms. Hudson misrepresents the relationship between Organ Procurement Organizations ("OPOs") and hospital facilities.

87.    The Association of Organ Procurement Organizations ("AOPO") and regulations from the Center for Medicare and Medicaid Services ("CMS") instruct that OPOs are not vendors, business associates, or contractor service provides of hospitals.

88.     Standard credentialing programs for vendors, business associates or contract service providers do not apply to OPO staff, and hospitals cannot deny OPO staff access.

89.     42 C.R.F. § 482.45 provides that OPOs and hospitals enter into written agreements detailing the duties and responsibilities both parties have with regard to donation.

90.     Hospitals do not have the right to bar the designated OPO or its staff from performing their OPO federal mandate in the hospital.

91.     Defendant has at least fifteen (15) agreements with hospitals and facilities pursuant to 42 C.R.F. § 482.45, including:

a.     Midwest Eye-Banks located in Ann Arbor, Michigan and William Beaumont Hospital, a Michigan non-profit corporation, with campuses located in Royal Oak, Troy, and Grosse Pointe, Michigan.

b.     Borgess Medical Center located in Kalamazoo, Michigan.

c.     Eversight located in Ann Arbor, Michigan and Mercy Health Saint Mary's located in Grand Rapids, Michigan.

d.     Eversight located in Ann arbor, Michigan and Munson Medical Center located in Traverse City, Michigan.

e.     Eversight located in Ann Arbor, Michigan and Providence-Providence Park Hospital located in Southfield and Novi, Michigan.

f.     Eversight located in Ann Arbor, Michigan and St. John Hospital and Medical Center located in Detroit, Michigan.

g.      Eversight located in Ann Arbor, Michigan and Mercy Health Campus and Mercy Health Hackley Campus located in Muskegon, Michigan.

h.      Eversight located in Ann Arbor, Michigan and Detroit Receiving Hospital & University Health Center located in Detroit, Michigan.

i.      Eversight located in Ann Arbor, Michigan and Hurley Medical Center located in Flint, Michigan.

j.      Eversight located in Ann Arbor, Michigan and Edward W. Sparrow Hospital association, Sparrow Carson Hospital, Sparrow Clinton Hospital, Sparrow Ionia Hospital, and Sparrow Specialty Hospital.

k.      Eversight located in Ann Arbor, Michigan and Spectrum Health System located in Grand Rapids, Michigan, on behalf of itself and each of wholly-owned and/or operated subsidiaries.

l.      Eversight located in Ann Arbor, Michigan and the hospitals St. Joseph Mercy Ann Arbor and St. Joseph Mercy Livingston, located in Ypsilanti and Howell, Michigan respectively.

m.      Midwest Eye-Banks located in Ann Arbor, Michigan and Henry Ford Health Systems located in Detroit, Michigan, on behalf of its hospitals; Henry Ford Hospital, Henry Ford West Bloomfield Hospital, Henry Ford Wyandotte Hospital, Henry Ford Macomb-Warren Hospital, and Henry Ford Macomb Hospital.

n.      Midwest Eye-Banks located in Ann Arbor, Michigan and McLaren Regional Medical Center located in Flint, Michigan.

o.      Michigan Eye-Bank located in Ann Arbor, Michigan and Regents of the University of Michigan on behalf of its University of Michigan Hospitals and Health System located in Ann Arbor, Michigan.

92.    Because standard credentialing programs for vendors, business associates or contract service providers do not apply to OPO staff who require access to the hospital facility, Defendant could have reasonably accommodated Plaintiffs' religious or medical exemptions by providing PPE just as it did since the beginning of the pandemic.

93.    Not all Plaintiffs require access to healthcare facilities.

94.    Some Plaintiffs can temporarily and/or permanently work remotely.

95.    Defendant extended remote work as a religious accommodation to a Hospital Development Manager.

96.    Plaintiffs needing to visit healthcare facilities could have done so by following existing COVID-19 protocols.

97.    On or about October 25, 2021, Defendant terminated all Plaintiffs.

98.    Defendant never engaged in the interactive process.

99.    Defendant did not explain to Plaintiffs why some employees were accommodated while others were denied accommodation without bilateral cooperation or an interactive process.

100.    Defendant stated that it could not identify "any other accommodations that would enable you to perform the essential functions of your job without being vaccinated in a way that does not create an undue hardship or pose a direct threat to the health and/or safety of you or others in the workplace."

24

**Defendant Violated EEOC Guidance**

101.   On March 1, 2022, the EEOC expanded its guidance on religious exemption to employer vaccine mandates under Title VII of the Civil Rights Act of 1964 ("Guidance").  This Guidance describes in greater detail the framework under which the EEOC advises employers to resolve religious accommodation requests. *See* Guidance, *supra*.

102.   The EEOC emphasizes that as a reasonable accommodation, an unvaccinated employee entering into the workplace might wear a facemask, work at a social distance from coworkers or non-employees, work a modified shift, get periodic tests for COVID-19, be given the opportunity to telework, or finally, accept a reassignment.  *Id*. at K.2.

103.   The EEOC states that an employer cannot rely on speculative hardships when face with an employee's religious objection but, rather, should rely on objective information. *Id*. at L.3.

104.   The EEOC states that, in many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices, or observances without imposing an undue hardship. *Id*. at K.12.

105.   The EEOC instructs, "[i]f the employer denies the employee's proposed accommodation, the employer should explain to the employee why the preferred accommodation is not being granted." *Id*. at L.5.

106.   "[T]he definition of religion is broad and protects, beliefs, practices, and observances with which the employer may be unfamiliar." *Id*. at K.12.

107.   "The definition of 'religion' under Title VII protects both traditional and nontraditional religious beliefs, practices, or observances, including those that may be unfamiliar to employers." *Id*. at L.2.

108.   "The employer should ordinarily assume that an employee's request for religious accommodation is based on sincerely held religious belief, practice, or observance." *Id*. at K.12.

109.   "Employers should evaluate religious objections on an individual basis." *Id*. at L.2.

110.   The EEOC states:

> An individual's beliefs – or degree of adherence – may change over time and, therefore, an employee's newly adopted or inconsistently observed practices may nevertheless be sincerely held. An employer should not assume that an employee is insincere simply because some of the employee's practices deviate from the commonly followed tenants of the employee's religion, or because the employee adheres to some common practices but not others. *Id*. at L.2.

111.   "An employer should thoroughly consider all possible reasonable accommodations." *Id.* at K.12.

112.   In most circumstances, it is possible to accommodate religious beliefs "without imposing an undue hardship." *Id*. at L.3.

**Defendant Did Not Base Its Decision on Undue Hardship,
Nor Could It Establish Undue Hardship**

113.   Pursuant to Title VII, the prohibition against religious discrimination imposes an affirmative duty on employers to reasonably accommodate the religious observances and practices of its employees, unless the employer can demonstrate that such an accommodation would cause undue hardship to the conduct of its business.  *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977).

114.   "The obligation to provide religious accommodations absent undue hardship is a continuing obligation that allows for changing circumstances." Guidance at L.6.

115.   Defendant bears the burden to show "that it is unable to reasonably accommodate the employee's religious beliefs without incurring undue hardship." *McDaniel v. Essex Intern., Inc*., 571 F.2d 338, 341 (6th Cir.1978); *see also Baz v. Walters*, 782 F.2d 701, 706 (7th Cir.1986); *Redmond v. GAF Corp*., 574 F.2d 897, 901 (7th Cir.1978); *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1512 (9th Cir.1989).

116.   In the instant case, Defendant cannot show undue hardship.  To date, Defendant has not stated why granting Plaintiffs an accommodation poses an undue hardship.

117.   Defendant has not explained its criteria for determining whether an accommodation poses an undue hardship.

27

118.   An employer does not satisfy its burden "merely by showing that an accommodation would be bothersome to administer." *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975).

119.   Without a proffered explanation as to why Defendant would endure undue hardship to accommodate Plaintiffs individual, Defendant relies on hypothetical hardships by default.

120.   "A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships; instead, it must be supported by proof of actual imposition on co-workers or disruption of the work routine." *Towney Eng'g & Mfg. Co.*, 859 F.2d at 615 (9th Cir. 1988).

121.   "An Employer cannot rely on speculative or hypothetical hardship when faced with an employee's religious objection but, rather, should rely on objective information." Guidance at L.3.

122.   Defendant's actions demonstrate a motive to avoid granting religious accommodations.   "[A]n employer who acts with the motive of avoiding accommodation may violate Title VII even if [it] has no more than an unsubstantiated suspicion that accommodation would be needed." *Avercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773, 135 S. Ct. 2028, 2033, 192 L. Ed. 2d 35 (2015).

**COUNT I**
**Violation of Title VII, 42 U.S.C. § 2000e, *et seq*.**
**<u>Religious Discrimination – Failure to Accommodate</u>**
On Behalf of Plaintiffs Jennifer Beattie, Darren Drury,

28

Jeffery Jackowski, Craig Joseph, Aurora Northrup,
Lisa Strong, Steward Szczepanski, and Paul Wiederhold

123.   Plaintiffs restate the foregoing paragraphs as set forth fully herein.

124.   At all times relevant hereto, Plaintiffs were employees and Defendant was their employer for the purposes of 42 U.S.C. § 2000e, *et seq*.

125.   Title VII of the Civil Rights act of 1964, 42 U.S.C. § 2000e *et seq*., makes it unlawful for an employer to fail or refuse to reasonably accommodate the religious beliefs and practices of an employee or prospective employee.

126.   Title VII prohibits an employer from discriminating against an employee "because of such individual's... religion." 42 U.S.C. § 2000e-2(a)(1).

127.   This "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that [it] is unable to reasonably accommodate an employee's... religious observance or practice without undue hardship on the conduct of the employer's business." *Id*. § 2000e(j).

128.   After receiving an accommodation request, "the employer is obligated by law to engage in interactive process – a meaningful dialogue with the employee[.]" *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009).

129.   The employer must act in "good faith," *Id*., and the employee must "make a good faith attempt to satisfy his needs through means offered by the employer," *Brener v. Diagnostic Ctr. Hosp*., 671 F.2d 141, 146 (5th Cir. 1982)

130.   Title VII makes it unlawful for an employer to retaliate against an employee who engaged in protected activity.

131.   The value of religious freedom has been "zealously protected, sometimes even at the expense of other interests of admittedly high social importance." *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972).

132.   Plaintiffs hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.

133.   Plaintiffs informed Defendant of those beliefs and requested religious accommodations from the vaccine mandate.

134.   Defendant refused to engage in the interactive process with Plaintiffs regarding their religious accommodation requests and instead effectively terminated each of them by placing Plaintiffs on indefinite unpaid leave

135.   Under Title VII, Plaintiffs can establish a *prima facie* case of religious discrimination based on a failure to accommodate by showing: (1) they have *bona fide* religious beliefs that conflict with an employment requirement; (2) about which they informed the [Defendant]; and (3) they suffered an adverse employment action for failing to comply with the conflicting employment requirement. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986).

136.   Defendant concedes the first and second prongs in the August 27, 2021, response that accepted Plaintiffs' religious beliefs and purportedly granted them an

"accommodation." As such, defendant has acknowledged that Plaintiffs have valid, sincerely held religious beliefs.

137. Multiple accommodations could have been offered to Plaintiffs, although some of them already worked remotely and required no accommodation other than not having to be vaccinated.

138. For Plaintiffs who worked in the office or onsite at healthcare facilities, accommodations abound. They include mask wearing and periodic testing for COVID-19 – the very same accommodations being offered to virtually every public and private employee in the State of Michigan.

139. Defendant would not suffer undue hardship by granting Plaintiffs an accommodation. 42 U.S.C. § 2000e(j).

140. The issue became moot when Defendant failed to engage each employee in "a meaningful dialogue" about the accommodation request and learn whether an acceptable accommodation would impose undue hardship. *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009).

141. Instead, Defendant announced a one-size-fits all approach to accommodation that deprived Plaintiffs of the conversation necessary to discover what accommodations were possible. *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party

determine what specific accommodations are necessary" and "[a] party that fails to communicate... may also be acting in bad faith").

142.   Plaintiffs suffered adverse employment actions by being placed on involuntary unpaid leave indefinitely, losing their health insurance, and then being unceremoniously terminated. Involuntary indefinite unpaid leave cannot possibly be reasonable because a "[r]easonable accommodation is by its terms most logically construed as that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in question." *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995).

143.   Irrespective of the interactive process, Defendant failed to provide Plaintiffs with reasonable accommodations for their religious beliefs.

144.   As a result, all Plaintiffs were left in the dark regarding (a) what about their accommodation request posed an undue hardship; and (b) why they individually could not be accommodated.

145.   Defendant thereby discriminated against Plaintiffs because of their religious beliefs.

146.   Defendant's failure to provide religious accommodations has harmed and will continue to harm Plaintiffs.

147.   As a direct and proximate result of Defendant's violation of Title VII Plaintiffs have suffered feelings of depression, emotional and physical distress,

mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

148.   As a further direct and proximate result of Defendant's violation of Title VII, Plaintiffs have been denied employment and placed in financial distress and have suffered a loss of earnings and benefits, and a loss of and impairment of their earning capacity and ability to work and will so suffer in the future; they have been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

149.   By failing to engage in the interactive process or offer any reasonable accommodation, Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

**COUNT II**
**Violation of Title VII, 42 U.S.C. § 2000e, *et seq*.**
**<u>Religious Discrimination – Retaliation</u>**
On Behalf of Plaintiffs Jennifer Beattie, Darren Drury,
Jeffery Jackowski, Craig Joseph, Aurora Northrup,
Lisa Strong, Steward Szczepanski, and Paul Wiederhold

150.   Plaintiffs restate the foregoing paragraphs as set forth fully herein.

151.   At all times relevant hereto, Plaintiffs were employees and Defendant was their employer for the purposes of 42 U.S.C. § 2000e, *et seq*.

152.   Title VII prohibits an employer from discriminating against an employee "because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). This "includes all aspects of religious observance and practice, as well as

33

belief, unless an employer demonstrates that [it] is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j).

153.   Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), it is unlawful for an employer: (1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's... religion; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individuals... religion[.]"

154.   Defendant's mandatory vaccination policy evades any sort of bilateral cooperation or interactive process, and it instead granted a false accommodation of indefinite unpaid leave of absence—which is not an accommodation at all. *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (stating that, consistent with the goals expressed in the legislative history of Title VII's religious accommodation provision, "courts have noted that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business"). Simply

by failing to engage with Plaintiffs as to the possible reasonable accommodations, Defendant has violated the law.

155.   Plaintiffs engaged in protected activity when they requested religious accommodations from Defendant's vaccine mandate.

156.   Defendant responded almost immediately by announcing that it would effectively terminate their employment.   This was so even though Defendant conceded that many of the requests for religious accommodation are legitimate by "granting" those requests.

157.   Defendant's response to Plaintiffs' protected activity with a draconian threat of years of unpaid leave is an adverse employment action intended to force employees to forgo their religious beliefs and receive the COVID-19 vaccine. Defendant chose to retaliate by giving the employees the false choice between vaccination and effective termination.

158.   Defendant retaliated against Plaintiffs when it responded to requests for a religious or medical accommodations by placing each employee who requested one on involuntary indefinite unpaid leave, with benefits soon being stripped away, and then formally terminating them by October 26, 2021.

159.   Plaintiffs' religious beliefs and protected activity were the causes of Defendant's adverse employment action. Indeed, Defendant's derisive view of employees with religious beliefs has been documented. Defendant did not bother

engaging in an interactive process with accommodation seekers because it never intended to provide them with a reasonable accommodation.

160.   By retaliating against Plaintiffs for engaging in protected activity, Defendant has violated Title VII.  This violation has harmed and continues to harm Plaintiffs.

**COUNT III**
**Violation of the ADA, 42 U.S.C. § 12101, *et seq*.**
**<u>Disability Discrimination – Failure to Accommodate</u>**
On Behalf of Plaintiffs Renate Black and Angel Vianueva

161.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

162.   Plaintiffs Black and Vianueva informed Defendant of their disabilities.

163.   Plaintiffs Black and Vianueva sought disability accommodations, both are "qualified individuals" under the definition of 42 U.S.C. § 12111[1], requested reasonable accommodations for their specific disabilities with respect to Defendant's vaccination policy in writing by submitting Defendant's required exemption form.

164.   After receiving an accommodation request, "the employer is obligated by law to engage in an interactive process—a meaningful dialogue with the employee[.]" *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009).

---

[1] Plaintiffs "with or without reasonable accommodation, can perform the essential functions of employment position that such individual holds or desires." *Id*.

165.   The employer must act in "good faith," *id.*, and the employee must "make a good faith attempt to satisfy his needs through means offered by the employer," *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982).

166.   Defendant has a duty under 41 U.S.C. § 12112(b)(5)(a) to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."

167.   Employers are not "free to choose an unreasonable form of accommodation over a reasonable one." *Ansonia Bd. of Educ v. Philbrook*, 479 U.S. 60 (1986).

168.   In determining whether a Defendant has engaged in an adequate search for a reasonable accommodation, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Id*. at 1285. The only breakdown here occurred when Defendant refused to engage with Plaintiffs and instead announced a single accommodation for everyone.

169.   Defendant refused to engage in the interactive process with Plaintiffs regarding their medical accommodation requests.

170.   Defendant violated the ADA when it denied or effectively denied Plaintiffs' accommodation requests.

171.   Where Defendant offered indefinite unpaid leave as an accommodation, it failed to provide a reasonable accommodation.

172.   Defendant thereby discriminated against Plaintiffs because of their disabilities.

173.   Defendant's failure to provide medical accommodations has harmed and continues to harm Plaintiffs.

174.   By failing to engage in the interactive process or offer any reasonable accommodation, Defendant's discriminatory actions were intentional and/or reckless, and in violation of the ADA.

175.   Plaintiffs have filed charges with the EEOC complaining of these discriminatory actions. This Court may exercise its equity jurisdiction to grant preliminary injunctive relief to preserve the status quo pending completion of the EEOC's administrative process. *See Drew*, 480 F.2d at 74; *Wheeler v. Jackson Nat'l Life Ins. Co.*, No. 3:14-cv-0913, 2015 WL 7776916, at *4 (M.D. Tenn. Dec. 2, 2015) (stating that in the Sixth Circuit, "the failure to exhaust administrative remedies" under the ADA "is not a jurisdictional defect") (citing cases).

**COUNT IV**
**Violation of the ADA, 42 U.S.C. § 1201, *et seq*.**
**Disability Discrimination – Retaliation**
On Behalf of Plaintiffs Renate Black and Angel Vianueva

176.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

177.   Plaintiffs Black and Vianueva engaged in protected activity when they requested medical accommodations from Defendant's vaccine mandate.

178.   Defendant responded by taking an adverse employment action against each employee when it announced that it would formally or effectively terminated their employment. This was so even though Defendant has conceded that many of the requests for medical accommodations are legitimate by "granting" those requests.

179.   Defendant's response to Plaintiffs' protected activity with a draconian threat of years of unpaid leave is an adverse employment action intended to force employees to forgo their medical reasons for not receiving the COVID-19 vaccine.

180.   Plaintiffs' medical disability and protected activity were the causes of Defendant's adverse employment action. As discussed above, Defendant's derisive view of employees with disabilities has been documented.

181.   By retaliating against Plaintiffs for engaging in protected activity, Defendant has violated the ADA.

182.   Plaintiffs have filed charges with the EEOC complaining of these retaliatory actions. This court may exercise its equity jurisdiction to grant preliminary injunctive relief to preserve the status quo pending completion of the EEOC's administrative process. *See Drew*, 480 F.2d at 74; *Wheeler*, 2015 WL 7776916, at *4.

**COUNT V**
**Violation of the ADA, 42 U.S.C. § 12112**
**ADA Confidentiality**
On Behalf of all Plaintiffs

183.    Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

184.    Plaintiffs engaged in protected activity when requesting an accommodation from the COVID-19 vaccine.

185.    Defendant responded by distributing a list of Plaintiffs' names and unvaccinated status to various healthcare facilities without consent.

186.    The EEOC emphasizes that the ADA requires an employer to maintain the confidentiality of employee medical information. Although the EEO laws do not prevent employers from requiring employees to provide documentation or other confirmation of vaccination, this information, like all medical information, must be kept confidential and stored separately from the employee's personnel files under the ADA. Guidance at K.4.

187.    The ADA requires employers to treat any medical information obtained from a disability-related inquiry or medical examination (including medical information from voluntary health or wellness programs), as well as any medical information voluntarily disclosed by an employee, as a confidential medical record. 29 C.R.F. § 1630.14(2).

188.    Employers may share such information only in limited circumstances with supervisors, managers, first aid and safety personnel, and government officials investigating compliance with the ADA. 42 U.S.C. §§ 12112(d)(3)(B), (4)(C); 29 C.R.F. § 1630.14(d)(4).

189. Defendant violated ADA confidentiality obligations by distributing their names and unvaccinated status to various healthcare facilities without consent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court enter the following relief:

a. Declare that Defendant has violated Title VII and the ADA by failing to engage in the interactive process in response to requests for accommodations to its COVID-19 vaccine mandate.

b. Declare that Defendant has violated Title VII and the ADA by discriminating against its employees by failing to provide reasonable accommodations to its COVID-19 vaccine mandate.

c. Declare that Defendant has violated Title VII and the ADA by retaliating against employees who engaged in protected activity.

d. Award Plaintiffs damages, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages.

e. Award Plaintiffs reasonable attorneys' fees and costs.

f. Grant any other relief that the Court deems just, proper, and equitable.

g. Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

Respectfully submitted,

HURWITZ LAW PLLC

/s/ *Noah S. Hurwitz*
Noah Hurwitz (P74063)
*Attorney for Plaintiffs*
614 Detroit St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com

Dated: September 23, 2022

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JENNIFER BEATTIE, RENATE BLACK,
DARREN DRURY, JEFFREY JACKOWSKI,
CRAIG JOSEPH, AURORA NORTHRUP,
LISA STRONG, STEWARD SZCZEPANSKI,
ANGEL VIANUEVA, and
PAUL WIEDERHOLD,                                    Case No.

Plaintiffs,                                         Hon.

v.

ORGAN PROCUREMENT AGENCY OF
MICHIGAN d/b/a GIFT OF LIFE MICHIGAN,

      Defendant.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
Kara F. Krause (P85487)
Brendan J. Childress (P85638)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
617 Detroit St., STE. 125
Ann Arbor, MI 48104
(844) 847-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com
kara@hurwitzlaw.com
brendan@hurwitzlaw.com

---

## DEMAND FOR TRIAL BY JURY

Plaintiffs Jennifer Beattie, Renate Black, Darren Drury, Jeffrey Jackowski,

Craig Joseph, Aurora Northrup, Lisa Strong, Steward Szczepanski, Angel Vianueva,

and Paul Wiederhold, by and through their attorneys HURWITZ LAW, PLLC, hereby demand a trial by jury, for all issues so triable.

Respectfully submitted,

HURWITZ LAW PLLC

/s/ Noah S. Hurwitz
Noah Hurwitz (P74063)
*Attorney for Plaintiffs*
614 Detroit St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com

Dated: September 23, 2022